No. 25-10758

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

OUTSOURCING FACILITIES ASSOCIATION; NORTH AMERICAN CUSTOM LABORATORIES, L.L.C. PARTNERS, DOING BUSINESS AS FARMAKEIO CUSTOM COMPOUNDING,

Plaintiffs-Appellants,

v.

FOOD & DRUG ADMINISTRATION; DR. MARTY MAKARY, COMMISSIONER, U.S. FOOD AND DRUG ADMINISTRATION,

Defendants-Appellees,

NOVO NORDISK, INC.,

Intervenor Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR FEDERAL DEFENDANTS-APPELLEES

*Of Counsel:*

MICHAEL B. STUART
  *General Counsel*
  *U.S. Department of Health and*
    *Human Services*
SEAN R. KEVENEY
  *Chief Counsel*
  *Food and Drug Administration*
WENDY VICENTE
  *Deputy Chief Counsel, Litigation*
RACHEL E. KING
LESLIE COHEN
  *Associate Chief Counsels*

ERIC J. HAMILTON
  *Deputy Assistant Attorney General*

RYAN R. RAYBOULD
  *United States Attorney*

DANIEL TENNY
CAROLINE W. TAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7236*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-4171*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties.  5th Cir. R. 28.2.1

## STATEMENT REGARDING ORAL ARGUMENT

This case involves the U.S. Food and Drug Administration's (FDA) determination that the shortage of certain drugs—semaglutide injection products, marketed as Ozempic and Wegovy—had ended. The district court correctly upheld that shortage determination in a thorough and reasoned opinion. Plaintiffs requested oral argument, and the government stands ready to present argument should the Court find it useful.

As discussed below, plaintiffs have also brought a separate challenge to FDA's decision to remove a different set of drugs—tirzepatide injection products, marketed as Mounjaro and Zepbound—from the shortage list. Plaintiffs' appeal is pending in this Court. *See Outsourcing Facilities Ass'n v. FDA*, No. 25-10600. Because both appeals raise substantially similar issues, the government respectfully suggests that if this Court is inclined to hear argument in both cases, it consider scheduling both arguments for the same sitting and with the same panel to conserve both this Court's and the parties' resources. Because each of FDA's decisions rest on confidential business data, however, the government does not believe these cases are suitable for consolidation.

ii

**TABLE OF CONTENTS**

<u>**Page**</u>

TABLE OF AUTHORITIES...............................................................................iv

INTRODUCTION ......................................................................................... 1

STATEMENT OF JURISDICTION ................................................................ 3

STATEMENT OF THE ISSUES ..................................................................... 3

STATEMENT OF THE CASE......................................................................... 4

      A.    Statutory and Regulatory Background .............................................4

      B.    Factual Background and Prior Proceedings...................................7

SUMMARY OF ARGUMENT ....................................................................... 19

STANDARD OF REVIEW ............................................................................ 20

ARGUMENT................................................................................................... 21

I.    FDA Lawfully Issued Its Shortage Decision Through
    Adjudication ..................................................................................... 21

II.   FDA's Shortage Decision Was Not Arbitrary and Capricious ........... 32

      A.    FDA Thoroughly Explained Its Decision.....................................33

      B.    Plaintiffs' Counterarguments Are Unavailing.............................39

CONCLUSION ............................................................................................. 57

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*American Airlines, Inc. v. Department of Transp.,*
   202 F.3d 788 (5th Cir. 2000) ............................................................... 23

*Barr v. SEC,*
   114 F.4th 441 (5th Cir. 2024) ............................................................. 32

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) ............................................................................ 31

*Catalyst Strategic Advisors, LLC v. Three Diamond Cap. SBC, LLC,*
   93 F.4th 870 (5th Cir. 2024) ............................................................... 20

*Chamber of Com. v. SEC,*
   443 F.3d 890 (D.C. Cir. 2006) ............................................................ 26

*City of Arlington v. FCC,*
   668 F.3d 229 (5th Cir. 2012), *aff'd,*
   569 U.S. 290 (2013) ................................................. 21, 22, 23, 24, 31

*Flight Training Int'l, Inc. v. Federal Aviation Admin.,*
   58 F.4th 234 (5th Cir. 2023) ............................................................... 22

*Goodman v. FCC,*
   182 F.3d 987 (D.C. Cir. 1999) ..................................................... 12, 27

*Huawei Techs. USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ........................................................... 42, 52

*Mann Constr., Inc. v. United States,*
   27 F.4th 1138 (6th Cir. 2022) ............................................................. 29

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
   60 F.4th 956 (5th Cir. 2023) ..................................................... 20, 32, 39

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ......................................................................... 20, 32

iv

*Outsourcing Facilities Ass'n v. U.S. FDA*,
  No. 4:24-cv-0953, 2025 WL 746028 (N.D. Tex. Mar. 5, 2025)
  .................................................................. 9, 10, 11, 12, 13, 23, 24, 25, 31

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92 (2015) ...................................................................................... 29

*Public Citizen, Inc. v. FAA.*,
  988 F.2d 186 (D.C. Cir. 1993) ................................................................... 42

*Qwest Servs. Corp. v. FCC*,
  509 F.3d 531 (D.C. Cir. 2007) ................................................................... 28

*Safari Club Int'l v. Zinke*,
  878 F.3d 316 (D.C. Cir. 2017) ................................................................13, 30, 31

*Shell Offshore Incorporated v. Babbitt*,
  238 F.3d 622, 628 (5th Cir. 2001) .............................................................29

*Sierra Club v. Peterson*,
  185 F.3d 349 (5th Cir. 1999) ..................................................................... 21

*Texas v. United States*,
  866 F.2d 1546 (5th Cir. 1989) ................................................................... 23

*Thompson v. Western States Med. Ctr.*,
  535 U.S. 357 (2002) ...................................................................................... 5

*United States v. Florida E. Coast Ry. Co.*,
  410 U.S. 224 (1973) ....................................................................... 22, 23, 24

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 551(4) ........................................................................................ 21
  5 U.S.C. § 551(6) ........................................................................................ 23
  5 U.S.C. § 551(7) ........................................................................................ 23
  5 U.S.C. § 553 ........................................................................................ 21, 25
  5 U.S.C. § 554 ............................................................................................. 21
  5 U.S.C. § 554(e) ................................................................................... 22, 23

5 U.S.C. § 706(2)(A) ........................................................................ 20, 32

Federal Food, Drug, and Cosmetic Act:
  21 U.S.C. § 301 *et seq.* ............................................................................ 4
    21 U.S.C. § 353a .................................................................................... 6
    21 U.S.C. § 353a(b)(1)(D) ............................................................. 6, 24, 31
    21 U.S.C. § 353b ..................................................................................... 6
    21 U.S.C. § 353b(a)(2)(A)(ii) ............................................................ 5, 31
    21 U.S.C. § 353b(a)(5) ...................................................... 6, 12, 24, 28, 31
    21 U.S.C. § 353b(d)(2)(A) .................................................................. 6, 12, 28
    21 U.S.C. § 353b(d)(4)(A) ..................................................................... 5
    21 U.S.C. § 355(a) .................................................................................. 4
    21 U.S.C. § 355(a)(2)(B) ........................................................................ 4
    21 U.S.C. § 355(b) ................................................................................. 4
    21 U.S.C. § 355(b)(1)(A)(i)-(viii) .......................................................... 4
    21 U.S.C. § 355(c)(1)(A) ........................................................................ 4
    21 U.S.C. § 355(c)(3)(E)(ii) ............................................................ 5, 12, 28
    21 U.S.C. § 355(c)(3)(E)(iv) .................................................................... 5
    21 U.S.C. § 355(d) .................................................................................. 4
    21 U.S.C. § 356c(h)(2) ...................................................................... 6, 23, 39
    21 U.S.C. § 356e .................................................................................... 39
    21 U.S.C. § 356e(a) ................................................... 2, 6, 9, 10, 25, 27, 40
    21 U.S.C. § 356e(c)(2) ...................................................................... 6, 26
    21 U.S.C. § 356e(c)(3) ...................................................................... 6, 26

28 U.S.C. § 1291 ........................................................................................ 3

28 U.S.C. § 1331 ........................................................................................ 3

**Regulation:**

21 C.F.R. § 314.81(b)(3)(iii)(*f*) .............................................................. 6

**Other Authority:**

Order, *Outsourcing Facilities Ass'n v. FDA*, No. 25-10385
  (5th Cir. Apr. 4, 2025), Dkt. No. 98-1 ..................................................2, 9, 19

## INTRODUCTION

Last February, the Food and Drug Administration (FDA) determined that the national shortage of certain approved drugs manufactured and marketed by Intervenor Defendant-Appellee Novo Nordisk, Inc. (Novo Nordisk or Novo) had ended. Under the Federal Food, Drug, and Cosmetic Act, FDA's determination triggered reinstatement of ordinary statutory restrictions on compounding copies of those drugs—restrictions that are temporarily lifted for drugs appearing on FDA's drug shortage list.

Plaintiffs are compounders who brought this challenge under the Administrative Procedure Act (APA) to FDA's decision to remove those drugs—semaglutide injection products (marketed as Ozempic and Wegovy)—from the shortage list. The district court twice rejected their arguments, relying in part on its decision rejecting plaintiffs' parallel challenge to FDA's decision to remove a different set of drugs—tirzepatide injection products (marketed as Mounjaro and Zepbound)—from the shortage list. The tirzepatide-related appeal is pending in this Court and involves substantially similar issues. *See Outsourcing Facilities Ass'n v. FDA*, No. 25-10600 (government response brief filed November 19, 2025). And in that case, this Court previously denied an injunction pending appeal for

"substantially the reasons given by the district court in its thorough opinion explaining its denial of a preliminary injunction." Order at 3, *Outsourcing Facilities Ass'n v. FDA*, No. 25-10385 (5th Cir. Apr. 4, 2025), Dkt. No. 98-1.

Plaintiffs offer no reason for this Court to reach a different conclusion here, where plaintiffs' arguments are based on the same erroneous understandings of the facts and law. Congress directed FDA to maintain an "up-to-date" list of drugs in national shortage. 21 U.S.C. § 356e(a). That mandate is incompatible with notice-and-comment rulemaking, and FDA reasonably chose to engage in informal adjudication when making the case-specific determination that the shortage of semaglutide injection products announced in 2022 had ended. That determination did not announce a new standard that only applies prospectively. Instead, FDA merely applied the statutory definition of shortage and determined that one number (the supply of the drug) was bigger than another (the demand for the drug). Such a fact-specific determination is not a rule for which notice-and-comment rulemaking is required.

FDA's decision was also not arbitrary and capricious. FDA thoroughly explained the basis for its decision after conducting a

comprehensive and detailed review of the relevant data, including Novo Nordisk's inventory of both finished and semi-finished product, wholesaler orders, and demonstrated ability to monitor supply and demand and adjust its production capacities accordingly. Plaintiffs' contrary arguments misunderstand the governing law and record, and this Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.18. The district court granted summary judgment in favor of the government and Novo Nordisk on June 13, 2025, ROA.5490–5500 (sealed opinion), ROA.1035–1045 (redacted version), and entered final judgment on June 17, 2025, ROA.1046. Plaintiffs submitted a timely notice of appeal on June 18, 2025. ROA.1086. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether FDA's case-specific determination that the shortage of semaglutide injection products had ended is a rule that requires notice-and-comment rulemaking.

2. Whether FDA's decision was arbitrary and capricious.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, new drugs generally may not be sold in the United States without FDA approval. *Id.* § 355(a). To obtain FDA's approval, a manufacturer must generally submit a new drug application with certain information about the drug's safety and effectiveness and proposed labeling. *Id.* § 355(b). The approval process is demanding. FDA evaluates new drugs through multiple complex phases of studies, and each ingredient and component of the proposed drug—along with the methods of manufacturing the drug—must be described in the application to FDA. *Id.* § 355(b)(1)(A)(i)–(viii). FDA approves the application only if it finds that the drug is safe and effective for its intended use under the conditions of use described in the drug's labeling. *Id.* § 355(c)(1)(A), (d). Once a drug is approved, facilities producing the drug must also comply with "current good manufacturing practice[s]" to ensure that the drug has the "identity and strength, and meets the quality and purity characteristics, which it purports . . . to possess." *Id.* § 351(a)(2)(B).

4

FDA approval also results in some manufacturers' products receiving a five-year period of exclusivity. For example, Novo's semaglutide products (which include Ozempic and Wegovy) had exclusivity under 21 U.S.C. § 355(c)(3)(E)(ii) from 2017 until 2022. During that period, FDA was barred from approving other manufacturers' versions of drugs containing semaglutide. Under a different statutory provision, Ozempic and Wegovy now have an additional three-year period of more limited exclusivity extending into 2028. *See* 21 U.S.C. § 355(c)(3)(E)(iv).

Drug compounding is generally a "process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient." *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 360–61 (2002). Compounded drugs that meet certain conditions specified by the statute are not subject to the safety and effectiveness requirements that apply to FDA-approved drugs. Pharmacies and physicians that compound drugs under these conditions are known as 503A compounders, while outsourcing facilities, which are FDA-registered facilities that compound on a large scale and generally sell their drugs directly to hospitals and medical professionals, are known as 503B compounders. 21 U.S.C. § 353b(d)(4)(A). Outsourcing facilities are subject

5

to the "current good manufacturing practices" applicable to FDA-approved drugs; compounding pharmacies and physicians whose drugs meet the conditions of 21 U.S.C. § 353a are not. 21 U.S.C. §§ 353a, 353b.

Ordinarily, the Act restricts the compounding of drugs that are "essentially" copies of an FDA-approved drug. 21 U.S.C. §§ 353a(b)(1)(D), 353b(a)(5). Those restrictions are temporarily lifted, however, if FDA determines that there is a nationwide shortage of that drug. *See id.* §§ 353a(b)(1)(D), 353b(a)(5), (d)(2)(A); *see also id.* § 353b(a)(2)(A)(ii). A shortage is defined as the "period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug." *Id.* § 356c(h)(2); 21 C.F.R. § 314.81(b)(3)(iii)(*f*).

FDA must maintain an "up-to-date list of drugs that are determined by [FDA] to be in shortage in the United States." 21 U.S.C. § 356e(a). FDA may choose, however, not to make information about the shortage publicly available if it might "adversely affect the public health," such as by "increasing the possibility of hoarding" or other disruptions to the supply of drug products. *Id.* § 356e(c)(3). FDA also may not disclose such information if it constitutes a trade secret or is otherwise confidential. *Id.* § 356e(c)(2).

6

### B.    Factual Background and Prior Proceedings

**1.** Novo Nordisk manufactures Ozempic, approved for type 2 diabetes, and Wegovy, approved for obesity. ROA.1168. Both drugs contain semaglutide as their active ingredient and are offered as injection products. ROA.1168.

Due to high demand that exceeded supply, FDA added the semaglutide injection products to its shortage list in 2022. *See* ROA.1168 (Wegovy added in March 2022 and Ozempic added in August 2022). As is its customary practice, FDA did not engage in notice-and-comment rulemaking to do so. After adding the relevant drugs to its shortage list, FDA continued to monitor supply and demand to assess whether the shortage was still in effect. *See* ROA.1168. FDA reviewed regular reports from Novo Nordisk as well as public information regarding patients' and pharmacies' abilities to obtain the relevant drugs. During this period, Novo also invested ▮▮▮▮▮ in expanding its production capacity to meet patient demand, *see* ROA.1616, and in ▮▮ , Novo ▮▮▮▮ ▮▮▮▮ its supply of Ozempic and Wegovy in the United States compared to ▮▮ , with plans to ▮▮▮▮▮ its supply ▮▮▮▮▮▮▮ . ROA.1182.

In February 2025, FDA declared that the shortage had ended. ROA.1165. FDA explained that decision in a 37-page decision memorandum, ROA.1165–1201, and 13-page declaratory order, ROA.1224–1236. To avoid unnecessary disruption to patient treatment and to facilitate an orderly transition, however, FDA stated that it did not intend to take action for violations of the statute that depend on semaglutide's shortage-list status against certain compounders who continued to compound the semaglutide injection products for a specified period of time. ROA.1198.

**2.** Plaintiffs Outsourcing Facilities Association and North American Custom Laboratories, LLC, filed this lawsuit under the APA shortly after FDA's decision. ROA.15.

**a.** Plaintiffs sought a preliminary injunction to block FDA's decision to remove the drugs from the shortage list. ROA.5491. The district court denied the motion, concluding that plaintiffs were unlikely to succeed on the merits of their APA claims because FDA was not required to issue its shortage decision through notice-and-comment rulemaking and its decision was not arbitrary and capricious. ROA.5178–5193.

**i.** With respect to whether notice-and-comment rulemaking was required, the district court "fully adopt[ed]" the reasoning and conclusion from its earlier decision rejecting an identical challenge to FDA's decision to remove a different set of drugs (certain tirzepatide injection products) from the shortage list. ROA.5183; *see Outsourcing Facilities Ass'n v. FDA (OFA I)*, No. 4:24-cv-0953, 2025 WL 746028, at *4–8 (N.D. Tex. Mar. 5, 2025) (Pittman, J.)). The court explained that this prior tirzepatide decision had "thoroughly" analyzed the relevant law and issues, and that this Court "seemingly agree[d] with" that decision when it denied plaintiffs' motion for an injunction pending appeal "[f]or substantially the reasons given by the district court in its thorough opinion explaining its denial of a preliminary injunction." ROA.5183 (citing Order, *Outsourcing Facilities Ass'n v. U.S. FDA*, No. 25-10385 (5th Cir. Apr. 4, 2025), Dkt. 98-1).

In *OFA I*, the district court had held that FDA was permitted to choose between adjudication and rulemaking in issuing its shortage decision and reasonably chose to proceed through adjudication. 2025 WL 746028, at *4–5. As the court explained, Congress directed the FDA to maintain an "up-to-date" list of drugs in national shortage. *Id.*; *see* 21 U.S.C. § 356e(a). That directive is incompatible with notice-and-comment

9

rulemaking, which typically requires a "minimum" 30-day comment period, followed by a period of time in which the agency must review the comments, respond to "significant" ones, and make "appropriate changes" before promulgating a final rule. *Id.* at *4–5. Thus, the district court explained, "even if the FDA expeditiously participated in notice-and-comment rulemaking, the process would take well over a month. Given the constant fluctuation in national supply and demand numbers for a given drug, a rule based on data that is more than a month old cannot be said to be based on 'the latest information' available." *Id.* at *5.

The district court further reasoned that requiring FDA to undergo notice-and-comment rulemaking to "*remove* a drug from its shortage list" would necessarily mean requiring FDA "to do the same to *add* a drug to the shortage list." *OFA I*, 2025 WL 746028, at *5 (emphases added). But such a prolonged process would mean that FDA's adding drugs to and removing them from the shortage list would be "based on stale information" and was again incongruent with "Congress's mandate for the FDA to maintain an 'up-to-date list of drugs . . . in shortage in the United States.'" *Id.* (alteration in original) (citing 21 U.S.C. § 356e(a)). "In contrast, through informal adjudication the FDA can act in a matter of days not months. And

10

while efficiency may not always be the benchmark for agency action, Congress's explicit command to keep the shortage list up-to-date makes efficiency important here."  *Id.*; *see* ROA.5183–5184.

The district court further concluded in the alternative that FDA reasonably chose to use adjudication rather than rulemaking "due to the issues presented" in "achieving meaningful notice-and-comment while maintaining" the drug manufacturer's confidentiality.  *OFA I*, 2025 WL 746028, at *4 n.3.  As the court explained, FDA's decision relies on confidential business data that FDA could not feasibly publish in the Federal Register or otherwise make available for meaningful public comment.  *Id.*

The court also rejected the argument that FDA's decision here was in effect a rule under the APA, as opposed to an adjudication.  As a preliminary matter, the court observed that plaintiffs' argument on this point put them in a "lose-lose scenario" because they seek to continue compounding copies of Novo's drugs based on FDA's 2022 determination that those drugs were in shortage—a determination that was also issued through informal adjudication without notice and comment.  *OFA I*, 2025 WL 746028, at *6.  If such determinations are rules that must undergo

notice-and-comment rulemaking, then, the court reasoned, plaintiffs "should not have been allowed to compound their versions of the drugs" in the first place.  *Id.*

In any event, the court was unpersuaded that the decision whether to add or remove a drug from the shortage list was in effect a rule requiring notice and comment.  Although such a decision has a "broad impact," the court explained that informal adjudications "can affect a large group of individuals without becoming a rulemaking."  *OFA I*, 2025 WL 746028, at *6 (citing *Goodman v. FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999)).  For example, FDA's drug approval process itself "triggers numerous effects on potential competitors," including by preventing FDA from approving new drug applications from competitors under certain circumstances and triggering statutory restrictions on compounding.  *Id.* (citing *e.g.*, 21 U.S.C. §§ 353b(a)(5), (d)(2)(A), 355(c)(3)(E)(ii)).  Plaintiffs nevertheless appeared to concede that FDA's drug approval process was an informal adjudication and the court was unpersuaded by plaintiffs' efforts to distinguish FDA approval of a new drug application from shortage determinations.  *Id.* & n.5.

The court similarly rejected plaintiffs' argument that FDA's decision created new law and was therefore a rule. *OFA I*, 2025 WL 746028, at *7. The court held that the decision was an adjudication because it had "immediate legal consequences for specific parties," including, for example, on plaintiffs (as FDA's decision would force their products off the market). *Id.*; *see id.* (discussing *Safari Club Int'l v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017)). The court additionally explained that FDA's decision did not promulgate a new "policy-type rule or standard"; it did not, for example, announce a new definition or interpretation of the statutory definition of shortage that would apply to circumstances in the future. *Id.* at *8. Instead, FDA "simply looked at the evidence presented and made a factual determination on whether one number was bigger than another." *Id.* That case-by-case determination provides no guidance as to future shortage determinations. *Id.*

**ii.** The district court further held that plaintiffs were unlikely to succeed on their arbitrary-and-capricious claims. ROA.5184. As relevant here, the court first dismissed plaintiffs' argument that FDA's consideration of ▇▇ data was improper. ROA.5185. The court explained that FDA had not relied *only* on ▇▇ data in making its decision, as

13

plaintiffs suggested, but instead reasonably considered a broad range of data including Novo Nordisk's extensive inventory reports showing a substantial surplus of the relevant drugs. ROA.5185–5186. The court also rejected plaintiffs' arguments that FDA's own presentation of the data revealed shortages, explaining that plaintiffs' efforts to manipulate the underlying figures "improperly attempt to combine different charts, depicting different metrics, to show a shortage." ROA.5186. The court noted that the data on which plaintiffs relied captured only a fraction of the relevant supply and excluded, for example, Novo's substantial inventory of finished and semi-finished products. ROA.5186 (discussing Tables 4 and 5 in ROA.1176–1177).

The court was also unpersuaded that Novo Nordisk's ██████ ████████████████████████████████████ ██████ ████████████ demonstrated a shortage in February 2025. ROA.5186– 5187. The court explained that FDA reasonably considered evidence that ████████████████████████████████████████ ████████████████████████████████████ and that Novo ████████████████████████████████ ██████████████ ROA.5187. The court also rejected plaintiffs'

14

objections to Novo's presentation of the data, explaining that "it is evident that the FDA had the correct data in front of it when promulgating" the shortage decision. ROA.5190. As to plaintiffs' contention that FDA failed to give sufficient weight to plaintiffs' evidence of a shortage, which included undated screenshots from wholesaler webpages, the court disagreed, stating (as it had in the tirzepatide appeal) that it was "not unreasonable for the FDA to consider detailed and comprehensive evidence to be more persuasive than website screen shots, some of which were undated." ROA.5191.

**b.** Plaintiffs did not appeal from the denial of preliminary injunctive relief and the parties cross-moved for summary judgment. The district court entered summary judgment in favor of the government. The court again concluded that FDA was not required to undergo notice-and-comment rulemaking, adopting in full the reasoning and conclusion from *OFA I.* ROA.5492.[1]

---

[1] The court also rejected plaintiffs' contention that FDA incorrectly interpreted the relevant provisions of the Federal Food, Drug, and Cosmetic Act. ROA.5492–5493. Plaintiffs do not renew that argument on appeal.

15

The court further held that FDA's decision was not arbitrary and capricious. The court recognized that the governing standard during arbitrary-and-capricious review is whether the agency "articulate[d] a rational relationship between the facts found and the choice made." ROA.5493 (quotations omitted). The court then rejected each of plaintiffs' contentions on this point.

The court first dismissed plaintiffs' contention that FDA had underestimated the extent to which compounders were satisfying demand. The court explained that plaintiffs' assertion that compounders accounted for 20 percent of the market "misread the very statements" on which plaintiffs relied. ROA.5494. That figure came from a CNN article and purported to estimate the demand related to the "compounding of *both* tirzepatide and semaglutide" as well as unapproved or off-label uses—not the U.S. market for Novo's approved semaglutide injection products. ROA.5494 (emphasis added). The court also observed that FDA had asked Novo about those figures and had reasonably taken into account the company's response. ROA.5494.

The district court further rejected plaintiffs' arguments that FDA erroneously failed to consider two isolated statements that Novo Nordisk's

16

CEO made in a November 2024 Reuters article.  ROA.5495.  The court stated that as a preliminary matter, FDA is not required under the APA to discuss "each and every piece of evidence or write an exegesis on every contention," and that, in any event, "the very record cited by Plaintiffs shows the FDA was aware of the [CEO's] comments and concerned about them."  ROA.5495; *see* ROA.1485 (FDA asking Novo Nordisk about the relevant statements).  Novo Nordisk explained that the CEO's statements referred to the global market for both the drugs at issue here, produced by Novo Nordisk, and the tirzepatide injection products produced by Eli Lilly and Company (Lilly), as well as the general need for diabetes and obesity treatments; the CEO was thus not discussing Novo's semaglutide injection products directly.  ROA.5495; *see* ROA.1485.  "Because the FDA did not simply ignore the comments but rather confronted Novo with them," the court held that plaintiffs failed to show it was "arbitrary for the FDA to give more weight to data and other detailed evidence than to two statements by Novo's CEO in early November 2024 that are seemingly taken out of context."  ROA.5495.

As to plaintiffs' remaining arguments regarding FDA's reliance on Novo Nordisk's evidence, the district court explained that it had already

17

"thoroughly addressed" and rejected those arguments in its preliminary-injunction denial and that plaintiffs provided no reason for the court to reach a different conclusion now.  ROA.5496; *see* ROA.5185–5191.  As before, the court again rejected plaintiffs' contention that FDA gave insufficient weight to plaintiffs' evidence, noting that its decision on this point had been "bolstered" at the summary-judgment stage by its review of the full administrative record.  ROA.5497–5499.  The court held that FDA reasonably gave more weight to Novo Nordisk's "specific, reliable, comprehensive, and current" business information over plaintiffs' "unsupported estimates" to the contrary, which included undated website screenshots and plaintiffs' letter to FDA asserting, "without citing a single source or providing any empirical data," that compounding makes up ███ of the market.  ROA.5498–5499; *see* ROA.5191.

Finally, the court was unpersuaded by plaintiffs' efforts to cast doubt on FDA's choice of time period in determining whether a shortage still persisted, explaining that plaintiffs' arguments "misquote the FDA" and that the record contradicts plaintiffs' assertion that FDA delegated the choice of the relevant parameters to Novo Nordisk.  ROA.5496.  The court further stated that FDA did not depart from prior policy in considering a

different time period here than it had in the tirzepatide case.  ROA.5497.

"In fact," the court explained, "the FDA's choice to evaluate a different

time period than [in the tirzepatide decision] bolsters the Court's decision

that the [shortage decision] did not promulgate a new policy-type rule or

standard that will govern the FDA's future actions but rather made a

specific factual determination based on the statutory definition of

shortage."  ROA.5497 (quotations omitted).

## SUMMARY OF ARGUMENT

FDA's determination that the shortage of semaglutide injection

products had ended is a straightforward application of the statutory text to

the facts of this case.  That type of factbound, case-specific determination is

a classic adjudication, as the district court correctly held and as this Court

previously endorsed in its order denying plaintiffs an injunction pending

appeal in the tirzepatide case for "substantially" the same reasons as the

district court's preliminary-injunction opinion.  Order at 3, *Outsourcing*

*Facilities Ass'n v. FDA*, No. 25-10385 (5th Cir. Apr. 4, 2025), Dkt. No. 98-1.

FDA's decision was also not arbitrary and capricious.  The agency's

determination that the demand or projected demand for the relevant drugs

no longer exceeded supply was based on a thorough review of

19

comprehensive and reliable data, which the agency fully explained in a reasoned manner. The district court correctly upheld that decision in a thorough opinion based on the full administrative record, and this Court should affirm.

## STANDARD OF REVIEW

Grants of summary judgment are reviewed de novo, "applying the same standard as the district court." *Catalyst Strategic Advisors, LLC v. Three Diamond Cap. SBC, LLC*, 93 F.4th 870, 874 (5th Cir. 2024). In considering whether an agency's action was arbitrary and capricious, a court is "not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see* 5 U.S.C. § 706(2)(A). The question instead is "whether an agency articulated a rational connection between the facts found and the decision made." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023).

20

## ARGUMENT

### I.     FDA Lawfully Issued Its Shortage Decision Through Adjudication.[2]

**A.**  As a general matter, agency proceedings can take the form of rulemaking or adjudications.  *City of Arlington v. FCC*, 668 F.3d 229, 239–40 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013).  Agencies enjoy "broad discretion" in deciding which route to pursue.  *Id.* at 240.  Under the APA, a "rule" is "designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4), while an "adjudication" is any other agency process "that results in a final disposition," *Sierra Club v. Peterson*, 185 F.3d 349, 366 (5th Cir. 1999).  With certain exceptions, if the agency proceeds through rulemaking, it must follow specific notice-and-comment requirements and may not publish a rule "less than 30 days before its effective date."  5 U.S.C. § 553.  Adjudications are not subject to those same requirements.  *City of Arlington*, 668 F.3d at 240; 5 U.S.C. § 554.

---

[2]  This issue is substantively identical to the one presented in the tirzepatide appeal, *Outsourcing Facilities Ass'n v. U.S. FDA*, No. 25-10600, and the district court decision on this point fully incorporated its decision in the tirzepatide case.  Plaintiffs make the same arguments here that they make in the tirzepatide appeal, and the government's responsive briefing on this issue is likewise materially identical.

21

The "basic distinction" between rulemaking and an adjudication is that a rulemaking promulgates "policy-type rules or standards" while an adjudication resolves "disputed facts in particular cases." *United States v. Florida E. Coast Ry. Co.*, 410 U.S. 224, 244–45 (1973); *see Flight Training Int'l, Inc. v. Federal Aviation Admin.*, 58 F.4th 234, 241 (5th Cir. 2023) ("The hallmark of a legislative rule is that it 'modifies or adds to a legal norm'" (citation omitted)). In determining the appropriate category, this Court considers (1) the "agency's characterization" of its own action, and (2) the "ultimate product" of that action. *City of Arlington*, 668 F.3d at 240.

Both factors support the district court's conclusion that FDA's shortage decision is an adjudication. First, FDA characterized the order as an informal adjudication, and this Court "accord[s] significant deference to an agency's characterization of its own action." *City of Arlington*, 668 F.3d at 241. FDA explained that the shortage determination was "the product of an informal adjudication" in which FDA evaluated the available evidence, made a determination of the relevant facts, and "applied the statutory standard for drug shortages to those facts." ROA.1228. FDA's order also invoked its authority under 5 U.S.C. § 554(e) to "remove uncertainty as to the status of the" relevant semaglutide injection products. ROA.1228–1229

22

(citing 5 U.S.C. § 554(e)); *see also* 5 U.S.C. § 551(6), (7) (defining "adjudication" to include the agency process for "the formulation of an order" that is "declaratory in form"). And this Court has previously categorized declaratory rulings issued under 5 U.S.C. § 554(e) as informal adjudications. *See, e.g.*, *City of Arlington*, 668 F.3d at 241; *American Airlines, Inc. v. Department of Transp.*, 202 F.3d 788, 796–97 (5th Cir. 2000); *Texas v. United States*, 866 F.2d 1546, 1555 (5th Cir. 1989).

More fundamentally, the "ultimate product" of FDA's determination bears all of the relevant characteristics of an adjudication. In deciding that the shortage was over, FDA did not announce a new interpretation of the Federal Food, Drug, and Cosmetic Act or establish a new standard or policy. Instead, Congress provided the definition of a drug shortage, 21 U.S.C. § 356c(h)(2), and FDA applied that straightforward definition— whether demand or projected demand exceeds supply—to a "particular set of disputed facts," *Florida E. Coast Ry. Co.*, 410 U.S. at 246; *see* 21 U.S.C. § 356c(h)(2). In so doing, FDA considered the relevant evidence and ultimately decided that "one number was bigger than another." *Outsourcing Facilities Ass'n v. FDA* (*OFA I*), No. 4:24-cv-0953, 2025 WL 746028, at *7 (N.D. Tex. Mar. 5, 2025) (Pittman, J.)). That determination was

23

not "generalized [in] nature," nor were the agency's factual findings "used in the formulation of a basically legislative-type judgment." *Florida E. Coast Ry. Co.*, 410 U.S. at 246. And in contrast to the purely "prospective application" of a rule, *id.*, the district court correctly concluded that FDA's adjudication "provides no guidance for any future shortage determination the FDA must make, as every shortage determination . . . must be made on a case-by-case basis." *OFA I*, 2025 WL 746028, at *8; *see* ROA.5492 (incorporating *OFA I*).

That FDA's decision has an "immediate and determinable impact on specific factual scenarios," because it reinstates the default statutory restrictions on plaintiffs' compounding, reinforces the decision's adjudicatory nature. *City of Arlington*, 668 F.3d at 243. Indeed, contrary to plaintiffs' assertion that FDA's shortage decision "changed the law," Br. 15, FDA's factual determination here merely reinstated Congress's default restrictions limiting copies of approved drugs in the absence of a drug shortage. *See* 21 U.S.C. §§ 353a(b)(1)(D), 353b(a)(5). The "law" limiting compounding copies absent a drug shortage is the Federal Food, Drug, and Cosmetic Act, not FDA's fact-based application of that statute. FDA has

24

thus not made any policy determination and its adherence to its statutory mandate is not a rule.

FDA also did not abuse its discretion in choosing to use adjudication for this purpose.  As the district court explained, by mandating that FDA keep its shortage list "up-to-date," 21 U.S.C. § 356e(a), Congress contemplated a process that would enable FDA to apply the settled legal framework to specific factual situations quickly enough to meet that statutory directive.  *See OFA I*, 2025 WL 746028, at \*5; ROA.5492.  The directive to keep an "up-to-date" list of drugs is incompatible with notice-and-comment rulemaking, which requires issuance of a proposed rule, a comment period, agency review of comments, issuance of a final rule, and (with limited exceptions) a 30-day delayed effective date.  5 U.S.C. § 553; *see OFA I*, 2025 WL 746028, at \*5.  Thus, the court reasoned, "even if the FDA expeditiously participated in notice-and-comment rulemaking, the process would take well over a month.  Given the constant fluctuation in national supply and demand numbers for a given drug, a rule based on data that is more than a month old cannot be said to be based on 'the latest information' available" as Congress required.  *OFA I*, 2025 WL 746028, at \*5.

The inherently public nature of notice-and-comment rulemaking also conflicts with FDA's statutory authority to withhold, at its discretion, shortage information—including the very existence of a shortage—in the interest of public health, such as to prevent hoarding. *See* 21 U.S.C. § 356e(c)(3). And meaningful public notice and comment is not possible in these circumstances, where the manufacturer has maintained as confidential the core set of facts material to the decision. Here, the most critical information that FDA must analyze is confidential business information and trade secrets—information that is not disclosable to the public, even in summary form. *See Chamber of Com. v. SEC*, 443 F.3d 890, 899–900 (D.C. Cir. 2006) (notice and comment requires revealing "for public evaluation" the "most critical factual material" upon which the agency relies); 21 U.S.C. § 356e(c)(2); *see also* ROA.1230–1231.

Although their position is not entirely clear, plaintiffs at times appear to accept that their argument—that the delisting decision requires notice-and-comment rulemaking—compels the conclusion that *adding* drugs to the shortage list also requires notice-and-comment rulemaking. *See, e.g.,* Br. 16. That concession would make sense, as FDA's actions in both scenarios are substantively the same. As discussed above, FDA considers

26

the relevant evidence and applies Congress's definition of shortage to the facts at hand, making a case-by-case determination as to whether one number is bigger than the other.  But plaintiffs have no satisfactory explanation for why requiring notice and comment to both add and remove a drug to the shortage list would make any sense, particularly, as explained above, in light of Congress's mandate that FDA maintain an "up-to-date" list of drugs in shortage.  *See* 21 U.S.C. § 356e(a).

Plaintiffs suggest that FDA's shortage decision could fall within the "good cause" or other exceptions to notice-and-comment requirements. *See* Br. 18–19.  But even assuming that drug shortage decisions would routinely qualify for the exception, by far the more natural conclusion is that FDA's factual application of a settled legal standard in real time is an adjudication, as the agency explained and as the district court correctly held.  *See* ROA.1232.

**B.**  In contending otherwise, plaintiffs rely principally on the effects of FDA's shortage decision.  *See, e.g.*, Br. 15, 21–22.  But "[j]ust as a class action can encompass the claims of a large group of plaintiffs without thereby becoming a legislative proceeding, an adjudication can affect a large group of individuals without becoming a rulemaking."  *Goodman v.*

27

*FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999).  Courts have accordingly rejected the argument that a "broadly applicable order" that determines the classification of a whole segment of a particular industry "can only take the form of a rule."  *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Cir. 2007).  Indeed, plaintiffs do not dispute that FDA approval of a new drug application is properly treated as an adjudication, even though such approvals are broadly applicable.  *See, e.g.*, 21 U.S.C. § 355(c)(3)(E)(ii) (triggering statutory exclusivity); *id.* § 353b(a)(5), (d)(2)(A) (restrictions on compounding).  FDA undertakes the same sort of analysis—applying a statutory standard to data specific to an individual drug—both when adding a drug to and removing a drug from the shortage list.  All of these determinations are adjudications.

There is likewise no merit to plaintiffs' complaint that no compounders "were party" to an adjudication.  Br. 21.  Adjudications—such as new drug approvals—regularly affect the interests of nonparties, and plaintiffs point to no case suggesting that an adjudication must include every conceivably affected entity as a party.  And in any event, to the extent FDA could without violating confidentiality—and in contradiction to plaintiffs' suggestions to the contrary—the record shows that the public

had an opportunity to submit data and analysis regarding the existence of a shortage. ROA.1232. Throughout that period, FDA received and considered information from a number of interested parties—including patients, pharmacy compounders, and outsourcing facilities—before issuing its shortage decision. ROA.1232.

The cases on which plaintiffs rely highlight the absence of any authority for the proposition that factbound decisions of this kind must be made through rulemaking. They first cite a series of cases that addressed the question whether an agency action was an interpretive rule (which lacks the force and effect of law and need not be promulgated through notice and comment) or a legislative rule (which has the force and effect of law and consequently generally requires notice and comment). *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015); *Mann Constr., Inc. v. United States*, 27 F.4th 1138 (6th Cir. 2022). That is an entirely distinct question from whether an action is a rule or an adjudication. Plaintiffs' reliance on this Court's statement that the action at issue in *Shell Offshore Incorporated v. Babbitt* was subject to notice and comment because it "'create[s] law'" by "'affect[ing] individual rights and obligations'" is therefore entirely misplaced. Br. 14–15 (quoting *Shell Offshore*, 238 F.3d 622, 628 (5th Cir.

29

2001)).  That portion of this Court's opinion was likewise about whether, even if the challenged action were a "rule," it fell within an exception to notice-and-comment requirements, a distinct question from whether an agency action is a rule or adjudication.  Plaintiffs also properly do not suggest that all substantive actions that have legal effects must undergo notice-and-comment rulemaking; adjudications, such as FDA's approval of a new drug application, also have legal effect.

Plaintiffs next identify a series of cases in which various sorts of decisions to place items on lists were treated as rulemakings, with minimal or no analysis.  *See* Br. 15–16.  It is unclear whether they mean to suggest that these disparate decisions are in some meaningful sense analogous to the determination at issue here, or whether they intend to discern some sort of per se rule relating to lists; in any event, they provide no support for either argument.

The one out-of-circuit case that plaintiffs discuss in slightly more depth (*see* Br. 22–23) demonstrates the perils of attempting to create bright-line rules in this area and highlights the adjudicative nature of the decision at issue here.  In *Safari Club International v. Zinke*, the D.C. Circuit concluded that the Forest Service's action "suspend[ing] the importation of

sport-hunted elephant trophies from Zimbabwe" was a rule.  878 F.3d 316, 323 (D.C. Cir. 2017).  But the court relied on the fact that the action had no "immediate legal consequences for any specific parties."  *Id.* at 333–34. That is distinct from FDA's shortage determination, which immediately triggers the ordinary restrictions on compounding, with collateral benefits to Novo Nordisk.  *See* 21 U.S.C. §§ 353a(b)(1)(D), 353b(a)(5), 353b(a)(2)(A)(ii); *City of Arlington*, 668 F.3d at 243.  Moreover, FDA's shortage determination does not impose a new standard that binds parties going forward.  *See Safari Club*, 878 F.3d at 334.  To the contrary:  FDA made a case-by-case determination that "one number was bigger than another," and that is a factbound, case-specific determination that provides no guidance as to future shortage determinations.  *OFA I*, 2025 WL 746028, at \*8.  Plaintiffs' unsupported assertion that adjudications are limited to actions with only a "retroactive" effect, Br. 23, is similarly wrong. Adjudications are appropriately used to determine "present rights and liabilities," as FDA did here.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring) (citation omitted).

## II.     FDA's Shortage Decision Was Not Arbitrary and Capricious.

Under the APA, a court evaluates final agency action for whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" based on a review of the full record.  5 U.S.C. § 706(2)(A).  Agency decisions are "presumptively valid."  *Barr v. SEC*, 114 F.4th 441, 447 (5th Cir. 2024).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co. (State Farm)*, 463 U.S. 29, 43 (1983).  The question instead is "whether an agency articulated a rational connection between the facts found and the decision made."  *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023).  A court thus considers only whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[s]" and whether, in reviewing the explanation, the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *State Farm*, 463 U.S. at 43 (quotations omitted).  FDA readily satisfied that standard here.

### A.    FDA Thoroughly Explained Its Decision.

FDA's explanation regarding its shortage decision was more than adequate.  As FDA explained in a detailed 37-page decision memorandum (ROA.1165–1201) and 13-page declaratory order (ROA.1224–1273), the agency concluded that the supply of the relevant drugs was meeting or exceeding demand and would meet or exceed projected demand.  ROA.1165.  In reaching this conclusion, FDA considered ███████████ data from Novo Nordisk spanning the period ███████████ before FDA's determination and projections for the following months after.  Such evidence included Novo Nordisk's inventory data from ███████████ ███████████ (including its inventory of both finished and "semi-finished" product), stock level reports, wholesaler shipments and orders, and projected demand figures based on ███████████ ███████████.  ROA.1169–1179.

As FDA explained, the evidence demonstrated that Novo could fulfill wholesaler orders while maintaining sufficient inventory to adjust to any fluctuations in demand.  For example, Novo reported a net inventory balance in ███████████ ███████████.  ROA.1169–1170; *see* ROA.1171 (Table 1).

Novo also reported regularly increasing stockpiles of finished product, *see* ROA.1171 (Table 2), as well as a substantial amount of "semi-finished" product, which Novo explained required only ███████████████ ███████████████████ could therefore be ████████████ ██████████████████████. ROA.1170–1171; *see* ROA.1170 (reporting roughly ██████████████████████████████████████ ████████████████████████). And Novo's stock-level reports indicated that the company had "at least ███████ ████████████████ on hand" to meet demand from all customers for each strength of Ozempic and Wegovy, and "██████████████████████████████████ ██████." ROA.1172; *see* ROA.1173 (Table 3).

FDA also concluded that Novo was able to meet wholesaler demand for the relevant drugs. FDA observed that since ███████████ Novo had been able to meet all orders for ████████████████████ as well as the ██████████████████████████. ROA.1174; *see* ROA.1176–1177 (Tables 4 and 5). As to ██████████████████████, although FDA acknowledged that ███████████████████████████████████████████████, FDA considered Novo's explanation that this was because ██████████████

34

and that Novo had

████████████████████████████████████████ ROA.1174–1175, 1634.

FDA further considered Novo's report that ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████ ROA.1179. Finally, and "importantly," FDA noted

that Novo ████████████████████████████████████████

████████████████████████████████████████. ROA.1175.

FDA also considered evidence regarding projected supply and demand. In evaluating Novo Nordisk's ability to meet projected demand, the agency considered the company's substantial inventory, including its representations that it had "███████████████" its supply of Ozempic and Wegovy in the United States ███████████████, and that it had expanded manufacturing capacity and planned to ███████████████ ████████████████████████ ROA.1182. Moreover, FDA noted, Novo Nordisk anticipated having "███████████████████████ ████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████" ROA.1185 (emphasis added).  By contrast, FDA

noted that Novo's projected demand for those same drugs during the same

period, as measured by ████████████████████████████

██████████████ was roughly ██████████████████████████

████████████████████. ROA.1184 (Table 9); *see* ROA.1183 ██████

██████████████████████████████████████

██████████████████████████), *see also* ROA.1604, 1640.

Given the above, FDA reasonably concluded that Novo Nordisk

could satisfy current and projected demand.  The agency acknowledged

that the actual future demand for Ozempic and Wegovy "may exceed

[Novo's] current demand projections because of future compounding

curtailment," as patients taking compounded forms of the drugs might

switch to Ozempic and Wegovy once the shortage ends and compounding

is curtailed.  ROA.1183–1184; *see* ROA.1193 ("We acknowledge . . . that

curtailing such compounding is likely to have some effect on the demand

for Novo Nordisk's products in the future.").  FDA nevertheless did not

believe, based on the evidence above, that any such additional

36

"transitional demand" would exceed Novo's "significant" projected supply. ROA.1183–1184, 1193. FDA also believed it was unreasonable to forecast that demand for the compounded product would translate one-for-one to demand for the approved products, given (among other things) differences in available dosage forms, price, insurance coverage, prescriber preferences, and marketing efforts. ROA.1192, 1196.

Although FDA did not have a "sufficient, reliable basis" to project the magnitude of such transitional demand, ROA.1993, FDA observed that the amount of the relevant drugs produced by compounders was still "limited" relative to Novo's production levels of Ozempic and Wegovy. ROA.1193–1195. For example, FDA explained, the outsourcing facilities reported producing an average of 310,000 packages per month—a small fraction of Novo's ability to supply ██████████████████████ ████ as well as its existing inventory of ████████████████████ ████████████████████████████. ROA.1195. While FDA recognized that "significant" compounding of the drugs was occurring and that some patients currently receiving the compounded products would seek the approved drugs when compounding is curtailed, FDA decided, based on its "best judgment" and "looking at the available information

37

with its limitations," that such a possibility did not undermine the conclusion that Novo's supply would meet or exceed projected demand. ROA.1197. FDA further stated that it would "closely monitor supply and demand over the coming months" and, if necessary, "return semaglutide injection products to the drug shortage list." ROA.1197.

FDA also considered reports that some patients and pharmacists were not able to obtain the approved drugs. That information came from one compounder's reports, nearly identical letters sent to FDA from individual email accounts, screenshots from wholesaler websites, news articles, blog posts, and individual comments submitted to FDA's general compounding docket. ROA.1187–1191. FDA concluded that such information did not undermine or outweigh Novo Nordisk's data. ROA.1185. Among other issues, FDA noted that many of the screenshots were outdated and that the form letters and news articles lacked individualized detail about patients' experiences, such as which drug was unavailable, the surrounding context (*e.g.*, whether the inability to obtain the drug was due to a product being out of stock as opposed to an inability to get a prescription), or when the access issue occurred. ROA.1187–1191. Additionally, FDA observed that "intermittent challenges of this kind" are

most likely explained by practical supply-chain dynamics and not an ongoing national shortage. ROA.1166, 1167. FDA's explanation was reasonable, as was the agency's decision to credit Novo's specific and comprehensive business data over other types of information.

## B. Plaintiffs' Counterarguments Are Unavailing.

Plaintiffs never come to grips with FDA's comprehensive analysis of the relevant market and instead attempt to nibble around the edges by isolating and complaining about particular pieces of evidence on which FDA relied. These contentions could not undermine the wealth of data that FDA considered and are in any event mistaken on their own terms. As the district court twice held, FDA examined the relevant data and articulated a "rational connection between the facts found and the decision made." *Mexican Gulf Fishing Co.*, 60 F.4th at 971.

**1. Period of time.** Plaintiffs insist that FDA erroneously failed to "disclose" what "period of time" the agency chose in making its shortage decision. Br. 25. That argument (which plaintiffs also raise in the tirzepatide opening brief) fundamentally misunderstands the governing statute. The statute vests in the Secretary the authority to maintain a list of drugs that are "determined by the Secretary" to be in shortage, 21 U.S.C.

39

§ 356e, with a shortage defined as the "period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug," *id.* § 356c(h)(2).  The relevant "period of time" as contemplated by Congress is therefore the period in which the shortage began and ended—which, as determined by FDA here, was in March and August 2022 (Wegovy and Ozempic, respectively) and until February 2025. Those are the relevant parameters in assessing what "period of time" refers to in the statute.  There is no separate requirement that FDA also define a sub-period of time for determining the end date of a shortage. Accordingly, plaintiffs' repeated arguments that FDA failed to define such a sub-period miss the mark.  FDA's decision here was consistent with its statutory directive to determine whether the country was still in the period of time in which demand exceeded supply, or whether that period was over.

To the extent plaintiffs also contend that FDA unlawfully failed to identify which period it was studying, Br. 26, plaintiffs ignore that Congress left the mechanics of making this determination in the expert discretion of the Secretary.  *See* 21 U.S.C. § 356e(a) (the Secretary "shall" maintain the list of drugs in shortage, and whether a drug should be added

40

or removed from the list is "determined by the Secretary"). And as the district court explained, as long as FDA's time period "includes the latest information available—such as data from January 2025 while making a determination in February 2025—it is entirely consistent with Congress's mandate." ROA.5184. FDA's decision here easily meets that criterion. In assessing whether the shortage had ended, FDA made clear that it considered data from ███████████████████████████ as well as projected data from ████████████████████████. ROA.1170–1185. There is nothing inappropriate about those parameters; that time period properly accounts for the latest information available at the time that FDA made its decision, and plaintiffs advance no argument that the chosen period is somehow not representative of supply-and-demand trends for the relevant market.

Plaintiffs' arguments about the "period of time" thus fail for the reasons explained above. The relevant point is that FDA provided a thorough explanation for how it reached the determination in question. FDA's consideration of data spanning █████████████████████ gave the agency a holistic picture of supply-and-demand trends over time,

41

including the most up-to-date information available, and plaintiffs cannot show that FDA's decision was unreasonable.

**2. Presentation of the evidence.** Plaintiffs then attempt to undermine FDA's decision by complaining about various parts of the agency's presentation of the evidence. For example, plaintiffs alternately complain about the agency's use of average, cumulative, and monthly data, without engaging with the significance of that information and the trendlines over time. *See, e.g.,* Br. 26, 29, 32, 33. The district court correctly rejected plaintiffs' haphazard arguments on this point. As the court explained, the APA does not require FDA to write an "exegesis" on every aspect of its decision or discuss "each and every piece of evidence." ROA.5495; *see Huawei Techs. USA, Inc. v. FCC,* 2 F.4th 421, 449 (5th Cir. 2021) (agency need not respond to every comment to satisfy arbitrary-and-capricious review); *Public Citizen, Inc. v. FAA.,* 988 F.2d 186, 197 (D.C. Cir. 1993) (same). Instead, the law requires only that FDA examine the relevant evidence and articulate a rational connection. FDA's explanation here plainly meets that deferential standard.

Plaintiffs first complain that one of Novo's tables (Table 1) included data from ▮▮▮▮▮▮▮▮▮ Br. 26, but that ignores essentially every other

42

aspect of FDA's 37-page decision analyzing, among other things, Novo's inventory, wholesaler shipments, and stock levels across multiple months. FDA did not rely solely on this ████████████████, and plaintiffs do not explain why considering a ████████████████████████████████ ████████████ is itself unreasonable.

Plaintiffs then complain about a different table (Table 2), which shows Novo Nordisk's average inventory of the drugs in ████████████ ████████████████████████████████████████████████. The table also shows Novo's steadily increasing stockpile of the drugs— which grew from roughly ████████████████████████████████ ████████████████████████████████████ ████████████████. ROA.1171. Ignoring the significance of this accumulation, plaintiffs appear to complain that reporting the figures as "average[s]" was the wrong accounting method, and that FDA instead should have considered a method that would allow them to compare inventory against purchases. Br. 27. But again, that argument ignores the rest of FDA's analysis, which did precisely that (evaluating Novo's inventory and stock-levels alongside wholesaler and customer orders over the same period). See ROA.1171–1177. To the extent plaintiffs suggest that

43

FDA "largely agreed" that inventory reports alone were insufficient, Br. 27, that is irrelevant inasmuch as FDA did not rely solely on inventory reports in making its shortage decision.

Plaintiffs also assert that FDA erred in considering inventory █ ████████████████████████. Br. 26, 29. Under that theory, FDA should have only considered inventory ██████████ as part of supply. But plaintiffs offer no support for this artificial understanding of supply-chain dynamics; indeed, inventory located in other parts of the supply chain can easily be used to fulfill orders in response to changing demand.

Plaintiffs also reiterate their argument that the presentation of Novo's evidence may have resulted in double- or triple-counting and that FDA failed to explain what measures it took to avoid that result. Br. 27–29 (discussing Tables 2 and 3). The district court correctly rejected this argument. As the court explained, plaintiffs misconstrue the way in which average monthly inventory is calculated. ROA.5188. That figure is based on the ███████████████████████████████████████████ █████████████████████████. ROA.5188. That reliance on ██████████ significantly undermines the likelihood of double-counting inasmuch as a package can only be in one location ██████████. ROA.5188; see, e.g.,

44

ROA.1171.  And even if there were some instances of double-counting, there is no reason to believe they are significant enough to detract from what the underlying data showed—that Novo had amassed a substantial amount of inventory that had been regularly increasing over a period of ███████ and that could easily be used to fill orders while Novo continued to produce more inventory.  *See* ROA.1171.  Indeed, the inventory figures for Novo's ███████████████████████████████████ ████████████████████████████, confirm this trend.  ROA.1708.

Plaintiffs' efforts to undermine FDA's reliance on "days on hand" data is also wrong.  Br. 28–29 (discussing Table 3).  As the agency's memorandum explains, days-on-hand is a measurement that Novo had used to refer to █████████████████████████████████████ ███████████████████████████████████████.  ROA.1172.  Thus, if Novo had ████████████████████████████████████████ ████████████████████████████████████████████ ROA.1172.  Plaintiffs' suggestion that FDA failed to consider Table 3's parameters or evaluate the underlying data is thus plainly wrong.  *See* ROA.1485 (FDA Question 8), 1605 (FDA Question 3), 1639–1640 (FDA Question 9b).

Plaintiffs next challenge FDA's consideration of cumulative supply-and-demand figures.  *See* ROA.1178-1179.  Plaintiffs assert that FDA improperly relied on ▮▮▮▮▮▮▮ to evaluate demand without addressing the limitations in that approach—namely, that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Br. 29–30 (discussing Figures 1 and 2, and Table 8).  But FDA was fully aware of those limitations.  As the agency explained, there are "important limitations" to ▮▮▮▮▮, including that it "does not account for unfilled prescriptions due to lack of supply." ROA.1181.  Plaintiffs further imply that FDA treated sales data as the sole evidence of demand, but that, too, is incorrect.  FDA evaluated a broad range of data, including inventory and wholesaler orders.  ROA.1176–1177.  To the extent that plaintiffs suggest it was unreasonable for FDA to consider ▮▮▮▮ at all in measuring demand, that is plainly false; after all, the number of people ▮▮▮▮▮▮▮ provides information about the number of people who want it.

Plaintiffs then insist that FDA's own evidence reveals a substantial shortage, citing two tables that plaintiffs created in this litigation.  Br. 30–31.  Those tables involve slicing and dicing one part of FDA's evidence

46

(Figures 1 and 2) and mixing and matching those results with a different set of figures (Tables 4 and 5).  But the underlying data comes from different sources and are reported in different ways.  The district court therefore rejected plaintiffs' "improper[] attempt to combine different charts, depicting different metrics, to show a shortage."  ROA.5186.  Plaintiffs' comparison is thus unremarkable:  Indeed, plaintiffs' "supply" figures are based on Tables 4 and 5, which show ███████████████

██████████████████████████████   *See* ROA.1176–1177.  Those figures thus *exclude* Novo's substantial (and growing) inventory of finished- and semi-finished product and therefore significantly undercount Novo's actual supply, as the district court recognized.  ROA.5186.  And as a general matter, there is no reason, even in the absence of any shortage, to presume that the number of shipments in a given month will precisely match the number of orders.  *Cf.* Br. 31 n.12.  A large order placed in one month and filled in the next, for example, could easily explain such a disparity.

For the reasons discussed above, plaintiffs miss the mark when they repeatedly assert that FDA erroneously failed to explain the parameters for Novo's business data or the measures FDA took to ensure such information

47

was not "manipulated." *See* Br. 32–34. Plaintiffs' citation (at 32) to various cases involving an agency's choice of a particular rule or standard are a far cry from the situation here, where FDA did not "choose" a particular metric or standard but simply applied the statutory definition of shortage to the facts before it and determined that one number was bigger than the other. Nor did FDA choose to present the data in any specific format. FDA considered Novo's business data in the form that the company used to track the inflows and outflows of the ▇▇▇▇ of packages being distributed across the country. FDA then considered that data alongside other sources of information to assess whether supply was meeting or exceeding demand.

FDA also did not depart from prior policy in determining that the shortage of semaglutide injection products was over. *See* Br. 34. As in the tirzepatide decision, FDA merely looked at the evidence to assess whether demand was exceeding supply. That is a fact-based determination, and there was therefore no prior "policy" announced in the tirzepatide decision from which FDA could depart, as the district court correctly explained. ROA.5497. The mere fact that FDA's decision was based on ▇▇▇▇ of data, whereas the decision in the tirzepatide case was based on ▇▇▇▇

of data, is therefore not a change in policy but rather a reflection of the fact that FDA made a fact-based determination in response to ongoing supply-chain dynamics and did not determine that the shortage was over until the evidence supported that conclusion. *See* ROA.5497.

   **3. Novo business data and other evidence.** FDA considered a broad range of business data in evaluating whether the shortage was over. One source of data included ███████████████████████████████████████████████ ████████████████████████████. *See* ROA.1176–1177 (Tables 4 and 5). In ████████████, Novo ███████████████████████████████████ ███████████████, providing strong evidence that there was no shortage as of that date. *See* ROA.1175, 1177. Plaintiffs seize on data from the ███████████████████████████ during which Novo shipped ████████ ████████████████████████████████████████████████████ ████████████████████████████ ROA.1177. According to Novo, those ████████████████████████████████████████████████ ████████████████████████████████████. ROA.1175. FDA considered that explanation and ultimately concluded that what was most "important[]" was that Novo was ████████████████████████ ████████████ ████████████; notably, FDA did not declare the shortage

49

over until February 2025.  ROA.1175.  Moreover, other independent data sources corroborated FDA's determination in February 2025 that the shortage had ended.

Plaintiffs' argument that Novo ███████████████████████ ████████████████████████ gets the record backwards.  Br. 37 (citing ROA.1174 n.41[3]).  Novo did not say that it ████████████████ ███████████████████████████████████ ████████████████████████████ ██████. Instead, Novo stated that ████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████████████████ ████████████████████████████████ ████████████████████████ ROA.1174 n.41.  There is thus no merit to plaintiffs' contention that FDA's decision contradicted itself and its cases on that point are inapposite.  Br. 38–39.

---

[3] Plaintiffs' opening brief refers to "ROA.1174 n.14," but it appears that plaintiffs meant to cite to ROA.1174 n.41.

Nor do two isolated comments from Novo Nordisk's CEO undermine FDA's decision.  Plaintiffs point to a Reuters article in which Novo's CEO discussed the demand for diabetes and weight-loss treatment.  Br. 39–41; *see* ROA.1918 (Reuters article).  Plaintiffs highlight two sentences from that November 2024 article—that "there are far more patients who would like to have the treatment than what both Lilly and we can supply," and that "we'll also see more volumes going into the U.S. market because we see an intact demand there, and we're far from saturating that demand."  Br. 39.  The comments on their face, however, do not help plaintiffs, as the CEO was making observations about the state of the world in November 2024 and FDA did not declare the shortage over until February 2025.

The record shows that FDA knew about the Reuters interview and had asked Novo about the very statements that plaintiffs discuss here.  *See* ROA.1485 (FDA Question 10).  Novo responded that the statements "d[id] not reflect the concepts of supply and demand" as relevant for FDA's drug shortage list, as the CEO was discussing the global market for *both* semaglutide and tirzepatide injection products—not the U.S. market for semaglutide injection products—as well as the general demand for

51

diabetes and obesity treatment as opposed to just Ozempic and Wegovy. ROA.1485. Plaintiffs' reliance on one wholesaler's comments regarding "GLP-1 drugs" (a broad category that includes both semaglutide and tirzepatide injection products, as well as some other drugs) fails for the same reason. Br. 40. Inasmuch as plaintiffs assert that FDA's failure to mention those statements in its decision renders the agency's decision unreasonable, Br. 40, plaintiffs are again mistaken. As the district court explained, there is no requirement that FDA discuss each and every piece of evidence in its decision and the record shows that the agency was aware of these comments and had considered them in its final decision. ROA.5495. In the context of the full record and FDA's thorough decision, that is sufficient. *See Huawei*, 2 F.4th at 449–56 (although agency "could have done more," agency decision was reasonable where agency considered and responded to relevant evidence and acknowledged limitations in its proposed approach).

Plaintiffs are again wrong to insist that FDA somehow did not consider the effect that its shortage decision would have on the demand for Ozempic and Wegovy. *See* Br. 41–48. As discussed above, FDA understood that the actual projected demand for Ozempic and Wegovy

52

may exceed Novo's demand projections given the effects of "future compounding curtailment," as patients taking compounded forms of the drug may switch to the brand-name form once compounding is curtailed. ROA.1183–1184; *see* ROA.1193. FDA reasonably concluded, however, that such transitional demand would not exceed projected supply given evidence of Novo's substantial inventory and expanded manufacturing capabilities as well as the differences between the compounded and approved product (such as differences in price, insurance coverage, and prescriber preferences). ROA.1184, 1192–1996.

Moreover, FDA observed that the amount of the relevant drugs produced by compounders was "limited" relative to Novo's production levels of Ozempic and Wegovy. ROA.1193–1195. As mentioned earlier, FDA explained that the outsourcing facilities reported producing an average of 310,000 packages per month—a small fraction of Novo's ability to supply ███████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████. ROA.1195. FDA thus reasonably determined that Novo's supply could meet demand, including any transitional demand created by patients who might switch from the compounded drug to the

53

approved versions.  ROA.1197.  And FDA explained that it would continue to monitor supply-and-demand trends and return the relevant drugs to the shortage list if necessary.  ROA.1197.

Plaintiffs rest their argument on the assumption that compounding represents 20 percent of the relevant market.  Br. 42.  As the district court explained, that assumption is misplaced.  ROA.5494.  Plaintiffs' source for that estimate is one sentence, taken secondhand from an October 2024 CNN article, stating that "[a]nalysts estimate that around 20% of all prescriptions of GLP-1 [receptor agonists] are for compounded versions of these drugs."  ROA.1346 (emphasis omitted).  But as the district court explained, that statement on its face does not support the idea that compounding accounts for one-fifth of demand, as the statement did not purport to discuss the market for Ozempic and Wegovy in the United States but rather all GLP-1 drugs (which include Lilly's tirzepatide injection products and other drugs) generally.  ROA.5494.  Moreover, the record shows that FDA was aware of this 20-percent estimate and asked Novo for an explanation.  ROA.1485 (FDA Question 5).  Novo responded that the "20 percent estimate . . . should not be understood to represent a 1:1 future demand for Novo Nordisk's semaglutide injection products," as that

estimate includes "compounding of other GLP-1 products (e.g., tirzepatide products), other dosage forms, different routes of administration, and products with multiple active ingredients." ROA.1485.  FDA thus considered this statement and reasonably determined that it did not undermine the conclusion that Novo could meet or exceed projected demand.  Nor is it unreasonable for FDA to credit Novo's timely business data regarding the specific drugs at issue in FDA's shortage decision over the outdated estimate from one CNN article regarding the broader market for these types of drugs as a whole.  *See* ROA.1192.

Finally, FDA did not unreasonably ignore countervailing evidence, as plaintiffs contend.  Br. 48–51.  On the contrary, FDA carefully considered the evidence plaintiffs press on appeal—screenshots of wholesaler webpages, individual communications, and reports from one compounder—and explained why that information did not undermine or outweigh Novo's business data.  ROA.1185–1191.  Among other issues, FDA noted that many of the screenshots were undated and the form letters lacked individualized details of patients' experiences (such as which drug was unavailable or whether the access issue was even related to supply).  ROA.1187–1191.  Moreover, FDA reasonably concluded that the

screenshots and form letters in general were less reliable than Novo's specific and comprehensive business data. FDA further considered and acknowledged that it had received reports indicating that "some" individuals may encounter challenges, but the agency reasonably explained that "intermittent challenges of this kind" are most likely explained by the practical dynamics between Novo Nordisk, wholesalers, pharmacies, and other customers, rather than an ongoing national shortage. ROA.1166. That decision was reasonable, as the district court twice held, and plaintiffs offer no reason for this Court to second-guess that thorough and carefully considered determination.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

MICHAEL B. STUART
  *General Counsel*
  *U.S. Department of Health and*
    *Human Services*
SEAN R. KEVENEY
  *Chief Counsel*
  *Food and Drug Administration*

WENDY VICENTE
  *Deputy Chief Counsel, Litigation*

RACHEL E. KING
LESLIE COHEN
  *Associate Chief Counsels*

ERIC J. HAMILTON
  *Deputy Assistant Attorney General*

RYAN R. RAYBOULD
  *United States Attorney*

DANIEL TENNY

 *s/ Caroline Tan*
CAROLINE W. TAN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7236*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-4171*
  *Caroline.Tan@usdoj.gov*

November 2025

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Caroline Tan*
CAROLINE W. TAN

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of <u>Federal Rule of Appellate Procedure 32(a)(7)(B)</u> because it contains 10,895 words.  This brief also complies with the typeface and type-style requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u>-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Caroline Tan*
CAROLINE W. TAN

ADDENDUM

## TABLE OF CONTENTS

21 U.S.C. § 356c .......................................................................................... A1

21 U.S.C. § 356e .......................................................................................... A2

**21 U.S.C. § 356c**

**§ 356c.  Discontinuance or interruption in the production of life-saving drugs**

. . .

**(h)  Definitions**

For purposes of this section –

. . .

(2)  the term "drug shortage" or "shortage", with respect to a drug, means a period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug; and

. . .

**21 U.S.C. § 356e**

**§ 356e.  Drug shortage list**

**(a)  Establishment**

The Secretary shall maintain an up-to-date list of drugs that are determined by the Secretary to be in shortage in the United States.

. . .

**(c) Public availability**

**(1)  In general**

Subject to paragraphs (2) and (3), the Secretary shall make the information in such list publicly available.

**(2)  Trade secrets and confidential information**

Nothing in this section alters or amends section 1905 of title 18 or section 552(b)(4) of title 5.

**(3)  Public health exception**

The Secretary may choose not to make information collected under this section publicly available under paragraph (1) or section 356c(c) of this title if the Secretary determines that disclosure of such information would adversely affect the public health (such as by increasing the possibility of hoarding or other disruption of the availability of drug products to patients).

. . .